Bristol, etc., Trust Co. *v.* Jonesboro, etc., Trust Co.

BRISTOL, ETC., TRUST CO. *v.* JONESBORO, ETC., TRUST CO.

|101 545|
|110 156|

(*Knoxville.* December 9, 1898.)

1. CORPORATIONS. *Corporate existence not in issue.*

Parties to a suit to wind up an insolvent corporation, who aver or admit corporate existence in their pleadings, are thereafter estopped to deny that fact. (*Post, p. 551.*)

2. SAME. *Finding of Court of Chancery Appeals that formation of, was not fraudulent, conclusive.*

The finding of the Court of Chancery Appeals that the formation of a corporation was not a fraudulent scheme or device to defraud the creditors of a partnership of a similar name and composed of the promoters of the corporation, is a finding of fact, and conclusive. (*Post, pp. 551, 552.*)

3. SAME. *Holder of stock not required.*

It is not essential that an applicant for charter, or a charter member, or a member of the board of directors, shall be a holder of stock in the corporation. A director is not an officer within the meaning of a by-law requiring all officers to be stockholders. (*Post, pp. 552, 553.*)

Case cited: Hume *v.* Bank, 9 Lea, 742.

4. SAME. *Similarity to partnership name.*

Mere similarity in the name of a corporation to that of a partnership, composed of the same persons—*e. g.*, "The Bluff Manufacturing Co." and "Bluff Manufacturing Company," cannot, as matter of law, be treated as a device to defraud the partnership creditors. (*Post, p. 553.*)

Cases cited: Memphis Water Co. *v.* Magens & Co., 15 Lea, 43; 125 U. S., 525.

5. SAME. *Organized to buy specific property.*

A corporation may be lawfully organized to buy a specific property or manufacturing plant, provided such property or plant

17 P—35

Bristol, etc., Trust Co. v. Jonesboro, etc., Trust Co.

is useful and convenient and suitable to its purposes, and its purposes are legal. (*Post, p. 554.*)

Cases cited: 21 Atl. Rep., 811; 14 S. W. Rep., 579; 32 N. Y. Rep., 260.

6. SAME. *Issuance of stock in payment for property.*

The stock of a corporation may be subscribed and paid for in property suitable for corporate purposes, provided the same is fairly done and in good faith. (*Post, p. 554.*)

Code construed: § 2335 (S.); § 1856 (M. & V.).

Cases cited: Thornton v. Payne, 6 Lea, 284; Albitztigui v. Guadalupe Co., 92 Tenn., 605.

7. SAME. *Transfer of partnership property to, not fraudulent.*

The transfer in good faith, by a solvent firm, of its entire assets to a corporation, in consideration of the issuance of its entire stock to the partners, will be upheld in a contest between existing creditors of the partnership and creditors of the corporation after both have become insolvent. (*Post, pp. 554–556.*)

Case cited and approved: Carver Gin Co. v. Bauman, 85 Tenn., 712.

Cited and distinguished: Barcroft v. Snodgrass, 1 Cold., 430; Anderson v. Norton, 15 Lea, 28; Vance v. McNabb Coal Co., 92 Tenn., 47.

8. SAME. *Proceeds of fire policies go to corporate creditors.*

The proceeds of fire policies taken out upon the corporate property by the corporation, or transferred to it, and on which the premiums have been paid by the corporation, go to corporation creditors, notwithstanding an attempted transfer, without corporate direction, of such policies, after the fire and the insolvency of the corporation had occurred, by the officers of the corporation for the benefit of their individual and partnership creditors. (*Post, pp. 556, 557.*)

9. SAME. *General insurance does not inure to the special benefit of bonds.*

General insurance taken by a corporation upon its property does not inure to the special benefit of bonds taken and held as collateral for a loan to the corporation upon a promise of its officers, which was never performed, that special insurance would

Bristol, etc., Trust Co. *v.* Jonesboro, etc., Trust Co.

be effected to secure such bonds. General insurance inures to the benefit of all bonds alike. (*Post, pp. 557–559.*)

Cases cited: 71 Fed. Rep., 797; 8 Page, 437; 32 Am. & Eng. Corp. Cas., 189.

10. SAME. *Bonds held as collateral canceled, when.*

When the liability for which corporate bonds have been deposited as collateral security has been discharged and satisfied, the bonds will be ordered canceled. (*Post, pp. 560, 561.*)

11. BILLS AND NOTES. *Innocent purchaser.*

. The indorsee of a note, being otherwise entitled to protection, cannot invoke the plea of innocent purchaser where he takes. the note upon the faith of a letter that gives him notice of equities. (*Post, pp. 559, 560.*)

---

FROM SULLIVAN.

---

Appeal from Chancery Court of Sullivan County. HUGH G. KYLE, Ch.

CURTIN & HAYNES for Bristol Bank & Trust Co.

KIRKPATRICK, WILLIAMS & BOWMAN for Jonesboro Banking & Trust Co.

ISAAC HARR for Watauga Bank.

NEWTON HACKER for First National Bank, Jonesboro.

WASHBURN, PICKLE & TURNER for State National Bank and Receiver.

BURROW BROS. for Patterson & Fry.

Bristol, etc., Trust Co. *v.* Jonesboro, etc., Trust Co.

J. G. ROSE for Lookout Bank, of Morristown.

NEWTON HACKER & SON for First National Bank, Greeneville.

SHOUN & SUSONG for M. J. Patterson.

WILKES, J.   This proceeding is a general creditor's bill to wind up an insolvent corporation and distribute its assets.   The principal litigation arises out of the claims of certain banks and individuals, who are creditors of a partnership known as "Bluff Manufacturing Company."   This partnership was succeeded by a corporation known as "The Bluff Manufacturing Company," which, upon its organization, took over the property and assets of the partnership, as will be hereafter more fully stated.   The cause was hotly contested in the Chancery Court and in the Court of Chancery Appeals, and the contest is renewed in this Court upon the appeal of all the parties who are principally interested.   As a result, we have a transcript of over fifteen hundred pages, about five hundred pages of briefs and arguments of counsel, an able opinion of the Chancellor (transcribed in the record), and an elaborate finding and opinion of the Court of Chancery Appeals, of one hundred and twenty-five pages.

Prior to September 9, 1891, A. J. Patterson and C. O. Fry, under the firm name and style of "Bluff Manufacturing Company," owned and operated a plant for the manufacture of cotton goods at Bluff

City. At that time a corporation was attempted and was organized under the name of "The Bluff Manufacturing Company." There were five applicants for the charter, and they became, under the statute, the charter members. By-laws were formulated and adopted, and by them the capital stock was fixed at $40,000, in shares of $100 each. The whole of this was subscribed by Patterson and Fry, and one share was transferred by them to Bachman, to enable him to become an officer of the corporation. The two other charter members, Curtain and Haynes, owned no stock. In payment of their subscription, Patterson and Fry transferred to the corporation the buildings, realty, and water privileges of the plant formerly owned by them as partners, but paid in no money. An election for directors was held, and the charter members were elected as the first board. Soon thereafter the board authorized the issuance of $30,000 in bonds, and directed that a mortgage be placed upon the corporate property to secure them. Twenty thousand dollars of these bonds were delivered to the partnership in payment of the machinery of the plant; $10,000, or the remainder of the bonds, were retained in the treasury for future uses or emergencies. A stock of goods, material, etc., on hand, was transferred by the partnership to the corporation, and credit given the former upon the books of the corporation, and thus the entire property of the partnership was passed over to the corporation. When this transaction took place and this transfer

was made, the partnership was indebted to various parties, including the First National Bank of Jonesboro, the First National Bank of Greeneville, the Jonesboro Banking and Trust Company, the Watauga Bank, a bank at Morristown, one at Knoxville, and probably others. The notes held by these banks were afterwards, from time to time, renewed by the partnership, and some, if not all, were secured by delivering to the banks a portion of the $20,000 in bonds owned by the partners.

Certain fire insurance taken out by the partnership was transferred to the corporation, and other insurance was taken out by the latter, the aggregate amount being about $18,500. In August, 1892, the buildings, machinery, and stock on hand were destroyed by fire. When the fire occurred the policies were on deposit with the First National Bank of Jonesboro, and on the day after the fire Patterson & Fry took them out and delivered them to the various banks, as collateral for the debts due by the partnership to the banks. Payment of the policies was resisted by the insurance companies, and suits were brought by the banks to recover upon them, and, pending these suits, this bill was filed May 26, 1893, as a general creditors' bill to wind up the corporation as insolvent. Amended bills, cross bills, and answers, and other pleadings were filed and proceedings had, until a voluminous record was made. A final decree, fixing the rights of the parties, was rendered in the Court below, from

which all parties appealed. The case, on hearing in the Court of Chancery Appeals, was elaborately argued, and the decree of the Chancellor was modified, and all parties have appealed to this Court.

We can only notice the most prominent and controlling features in the case, and these very briefly.

It is insisted there was no valid and legal incorporation. The Chancellor held that this question was not properly raised by the pleadings, and that the banks, in their answers and pleadings, had admitted the corporate existence, and were estopped, in the subsequent proceedings, from denying it. In this holding, we are of opinion the learned Chancellor was correct, and this feature of the case might be safely rested here, but the Court of Chancery Appeals has given, in great detail, the different steps taken to organize the corporation, and has fully considered the criticisms made, the main contention of fact being that the formation of a corporation was merely a scheme and fraudulent device to avoid the payment of the partnership's debts. The Court of Chancery Appeals, upon a full review of all the facts bearing on this feature of the case, finds that no fraud was intended; that the partners, Patterson & Fry, were amply solvent when the transaction occurred, and continued so for some time thereafter, and had ample assets to meet all the debts of the partnership, even after the corporation had been formed; that the incorporation took away nothing from the reach of creditors, but the stock and bonds

issued to Patterson and Fry, the partners, stood in the place and stead of the property. This, being a finding of fact in the main, is binding and conclusive upon us.

As to the legal aspect of the incorporation, the Court of Chancery Appeals report that it was attempted to be made under the general incorporation laws and amendments; that the charter was in form and registered as required by law, and that there was an organization thereunder; that by-laws were adopted, the amount of capital stock fixed thereby, the whole of it subscribed by Patterson and Fry, and paid fully by a transfer of the real estate and water power, which conveyance was also registered; that the charter members were elected the first board of directors; that Patterson was elected president, Fry vice president, and Bachman secretary and treasurer; that each of them was a stockholder, the latter owning one share, which had been transferred to him in order to make him eligible; that Curtin and Haynes, the other two directors, owned no stock. They further find that the bonds were soon thereafter issued, and the mortgage executed as the corporate action of the stockholders and board; that a seal was adopted; that by inadvertence the prefix, "The," was omitted from the impression, and its absence, afterward, sometimes supplied by writing the word, and at other times by leaving the space blank. The Court of Chancery Appeals report, as a fact, that all the requirements of the statute re-

lating to the organization of corporations were fully complied with, and that the corporation was legally formed according to the express provisions of the statute.

Referring to a number of criticisms made, we are of opinion that it is not absolutely necessary that a person should be a holder of stock in order to be an applicant for a charter, or a charter member, or a member of the board of directors. The by-laws, in this case, provided that every officer must be a stockholder, and it is evident that directors were not considered officers in the sense in which the term was used in the by-laws. The statute does not prescribe how much stock a corporation must have in order to organize and operate, nor that any share shall be subscribed before organization, nor how many stockholders there shall be. *Hume* v. *Bank*, 9 Lea, 742; Thompson on Corporations, Secs. 217, 224, 226, 247, 3858, 3859.

It is objected that the name adopted for the corporation was so nearly the same as that of the partnership that this must be treated as a fraudulent device. The Court of Chancery Appeals finds, however, that there was no fraudulent intent in fact in selecting and adopting the corporate name, and mere similarity in name cannot, as a matter of law, be treated as fraudulent. *McGowan* v. *American Tanbark Co.*, 125 U. S., 525; Thompson on Corporations, Sec. 284; *Memphis Water Co.* v. *Magens & Co.*, 15 Lea, 43.

In answer to another criticism, we can see no valid reason why a corporation may not be organized to buy a specific property, provided it is useful and convenient and suitable to its purposes, and such purposes are legal. The object of this corporation and the purpose of its formation was to own and operate a cotton manufactory. We can see no reason why, as a matter of legal right, it could not buy a plant already established and in operation, as well as found or build and stock a new one. 2 Cook on Stockholders, p. 966, and notes; *Coaldale Coal Co.* v. *Nat. Bank*, 21 Atl. Rep., 811; *Sayers* v. *Texas Land & Mortg. Co.*, 14 S. W. Rep., 579; *Kessler* v. *Levy*, 32 N. Y., Rep., 260.

It is objected that the corporation had no valid and *bona fide* stock; that the whole of its authorized stock was subscribed by Patterson and Fry and paid for by a transfer of partnership property, and that they paid no money. We can see no valid objection to this feature of the case. Stock may be subscribed and paid for in property suitable for corporate purposes, provided the same is fairly done and in good faith. 2 Thompson on Corporations, Sec. 1645; *Thornton* v. *Payne*, 6 Lea, 284; *Albitztigui* v. *Guadalupe Co.*, 8 Pick., 605; Morawetz on Corporations, Sec. 425, 426; 2 Waterman on Corporations, Sec. 188; Code (M. & V.), § 1856.

It is said the transfer of the partnership property to the corporation was a fraud, in fact, upon the creditors of the partnership; that it was without

a valid consideration, and without proper recognition of the rights of the creditors of the partners as against the assets of the partnership. The Court of Chancery Appeals has found the contention, so far as it is based upon fraudulent intent, to be without foundation in fact, and this is conclusive. The conveyances were not voluntary and without consideration, but were based upon the transfer of $30,000 of capital stock in the corporation and $20,000 of bonds issued by it. The creditors of the partnership had no lien upon its property, the partners had none, and creditors could not have any except through the partners. *Curver Gin Co.* v. *Bauman et al.*, 1 Pickle, 712.

It is not the case of an insolvent partnership, or one dissolved by death of one of its members, where creditors may assert and maintain a lien through the partners or their representatives, as in *Bancroft* v. *Snodgrass*, 1 Col., 430; *Anderson* v. *Norton*, 15 Lea, 28. Nor is it a case similar to that of *Vance* v. *McNabb Coal Co.*, 8 Pickle, 47, where both grantor and grantee were corporations, and the grantor conveyed all its assets, while heavily indebted, for a grossly inadequate consideration, making no provision and leaving no property for the payment of the debts of the grantor corporation. Here the individual members of the firm were amply solvent, and the transfer did not affect their ability at that time to pay, and creditors had ample recourse and protection in the individual property of the members.

It must be borne in mind, in the consideration of this and kindred questions, that the rights of the creditors of the corporation are as directly involved as are those of the partnership. The former dealt with the corporation in good faith, relying upon its corporate character and capacity, and also upon the recitals of the public records, that it owned the property conveyed to it by the partnership and could trust to it for their security.

The Court of Chancery Appeals find that there was no fraud in fact, and no concealment, and the registration of the charter and conveyance to the corporation were constructive notice of its existence and ownership, and in this view we concur.

We consider next the question raised as to the proper disposition of the proceeds of the fire insurance policies. It is insisted that this insurance was effected by the partners, Patterson and Fry, for the benefit of the partnership, and not of the corporation. The Court of Chancery Appeals finds that the policies were taken out by the corporation, or transferred to it; that they were upon corporate property, and for the benefit of corporate creditors generally, and the premiums paid by the corporation, and this finding is conclusive upon us. It further appears that, in the suits brought by the banks to collect the policies, they were stated to be the property of the corporation, and suits were prosecuted in its name to effect collection. While much

criticism is made of some of the evidential facts bearing on this finding, the main facts remain untouched—that it was treated as and actually was the property of the corporation. As before stated, these policies, which up to the fire had remained on deposit in the First National Bank of Jonesboro, were, the day after the fire, transferred to various banks, as collateral for debts owing them by the partnership and then pre-existing. This was done by Patterson and Fry, not in pursuance of corporate direction or instruction, and was an illegal or unauthorized diversion of corporate assets to partnership accounts or debts, and the proceeds having been collected by the banks under an agreement to appropriate them as might be finally decided to be legal or proper, they must be placed in the treasury of the corporation, to be administered as its assets among its creditors generally.

The First National Bank of Jonesboro presents the right to hold, for itself and the First National Bank of Greeneville, the proceeds of $7,000 of this insurance, under a claim additional to and different from the other banks. Conceding that it cannot hold the insurance collected by it to secure the debts it holds against the partnership, still it says that it holds $12,000 of the bonds of the corporation as collateral. These bonds are the property of the partners, and were deposited as collateral for their debts, and as to this there is no question.

Whether this insurance shall inure to the benefit of the bonds held by this bank, or go generally to the creditors of the corporation, is the question. It is not insisted that the insurance inures to the benefit of any other bonds than this batch of $12,000 held by the First National Bank of Jonesboro. As to it, it is claimed that a note for $2,000 was renewed January, 1892, and a new note executed for $5,000 at the same time, upon an assurance and promise that insurance would be taken out to secure the $12,500 of bonds which were accepted as collateral, and, upon the faith of this assurance and promise, the extension and loan were made. The Court of Chancery Appeals, as well as the Chancellor, find that such promise was made, but that it was not executed, but the insurance was taken out, not simply to secure the bonds, or a part of them, but for the benefit of the corporation generally. Neither the mortgage nor the bonds stipulated for any insurance for their security, and the policies, on their faces, do not provide for the bonds, or even mention them; so that, prior to the fire, whatever may have been the promises, they were unexecuted, and the insurance was for the benefit of the corporation generally. At the time the fire occurred, and when the policies were, in fact, transferred to the First National Bank of Jonesboro, the corporation was still a going concern, but it was, in fact, hopelessly insolvent, and this was well known to the partners and to the bank. The

transfer was not made in pursuance of any corporate action, but by Patterson and Fry, to secure their own notes and bonds, and, under these circumstances, the attempted transfer was a fraud upon the general creditors of the corporation, and cannot be sustained, and the proceeds of this insurance, held by the First National Bank of Jonesboro and its assignee, the First National Bank of Greeneville, must be turned back into the general treasury of the corporation, for the benefit of all its creditors alike, and for general distribution, as the other insurance. Thompson on Corporations, Secs. 6503, 6405; *Germania Safety Co.* v. *Boyton*, 71 Fed. Rep., 797; *Carter* v. *Rockett Ins. Co.*, 8 Paige, 437; *Wilson* v. *Metropolitan R. R. Co.*, 32 Am. & Eng. Corp. Cases, 189.

The Bluff Manufacturing Company corporation, sold to the Bristol & Elizabethton Railroad Company a right of way across its corporate property for $1,500. The railroad company executed its notes for this amount, payable to Reynolds and others, and they were indorsed, before maturity, and delivered to the First National Bank of Jonesboro, along with $7,000 of insurance, as collateral for the debts of the partnership. This delivery was made on the day after the fire, and, along with them, was delivered a letter from Curtin & Haynes in regard to the notes. The bank claims to be an innocent holder of these notes and entitled to collect the same. Its theory is that it extended notes of the partner-

ship upon an agreement that the indorsed notes, or other notes, would be deposited, and they were deposited in pursuance of the agreement. It is insisted by the bank that it had no notice that these notes were the property of The Bluff Manufacturing Company corporation, and were justified in taking them from the partners, Patterson and Fry. The Court of Chancery Appeals report that there was nothing on the face of the notes to indicate that they belonged to the corporation, and hence it concluded that the bank had no notice, and was an innocent purchaser, or holder, of the notes, and so decreed. In this we think the Court of Chancery Appeals was in error. The notes had been refused by the bank until the letter of Curtin & Haynes was received and attached to them, showing their authority to sign the name of the railroad to them. Upon the faith of this letter and the statements contained in it, the notes were accepted by it. It was error, therefore, not to consider this letter as a part of the notes, and not to find, upon a proper and correct interpretation of its terms and language, that the notes belonged to The Bluff Manufacturing Company; so that, in our opinion, as a matter of legal construction, the bank did know of the corporation's ownership of the notes, and could not be an innocent holder. This being so, the bank cannot collect these notes from the indorsers by virtue of the doctrine of innocent holder.

It appears that $3,000 of the treasury bonds of

the corporation were delivered to Reynolds and associates, to indemnify them in the indorsement of these notes for $1,500, and their guaranty to the railroad company of title to the right of way sold to it. Whether the issuance of these $3,000 of bonds was valid or legal, we need not determine. It appears that, during the pendency of the suit in the Court below, the railroad company paid into Court in this cause $1,600 in full satisfaction of the amount of purchase money owing for the right of way, and the same was accepted by all parties as full payment, and also as a discharge of all liens and incumbrances on the right of way, and this was ratified and confirmed by the Chancellor, and affirmed by the Court of Chancery Appeals, and to it no party in interest has objected, and the fund has been directed to be paid out upon the liens according to their priorities. The liability of the railroad to the corporation being fully extinguished, the notes are satisfied as to the maker and indorsers and will be delivered up and canceled. The purpose for which the $3,000 in bonds having been accomplished, they will be returned to the treasury of the corporation and canceled along with the $7,000 of bonds, which have all the while remained in the corporate treasury, so that $10,000 of the bonds will be canceled, and only $20,000 will be allowed to share in the distribution of the assets of the corporation.

17 P—36

There are other minor questions in the case upon which it is not necessary to write.

The decree of the Court of Chancery Appeals will be modified as herein directed, and the costs will remain as adjudged by it, and in all other respects the decree of that Court is affirmed.