## STATE OF NORTH DAKOTA EX REL. D. H. McARTHUR v. FRED McLEAN, Joseph M. Kelly, and the State Central Committee of the Democratic Party in the State of North Dakota.

### (159 N. W. 847.)

**Original and prerogative writ — supreme court — issuance of — public concern — ground for — attorney general — proceedings — refusal to bring — mere acquiescence in.**

1. Where the issuance of an original and prerogative writ is asked of the supreme court on the ground that the matter is of public concern, and the attorney general refuses to bring the proceedings, but expresses a willingness that they shall be brought, the case will be considered in the same light as if there had been merely a refusal on the part of the attorney general.

**Original writ — supreme court — public importance — matters of — involved — will issue — attorney general — refusal to act — or sanction.**

2. The supreme court will not refuse to issue its original writs where matters of public importance are concerned, merely because the attorney general refuses to himself bring or sanction the action.

**Supreme court — jurisdiction — question — test of — individual relator — necessary party — public injury — sought to be remedied — franchises — prerogatives of state.**

3. The test of the jurisdiction of the supreme court where the issuance of

an original writ is prayed for but the attorney general refuses to bring the proceedings is whether the individual relator is in fact a necessary party or a mere incident, and whether after all it is a public injury which is sought to be remedied or prevented, and involves the franchises and prerogatives of the state.

**Elective franchise — unhindered right to exercise — individual — collective sovereign state — publici juris — prerogatives of sovereign state — supreme court — discretion.**

4. The right to the untrammeled exercise according to law of the elective franchise, even though it is, strictly speaking, a right or franchise of the individual citizen rather than of the collective and sovereign state, and even though, in a limited area, is a matter not only *publici juris*, but one which ultimately affects the self-governing franchises and prerogatives of the sovereign state itself, and can in the discretion of the supreme court, and in exceptional cases, be safeguarded by the issuance of its prerogative writs.

**Public office — public position — sovereignty of state — subdivisions — attaches — whole public — benefit of — political party — state central committee — chairman of — not a public officer.**

5. A public office is a public position to which a portion of the sovereignty of the country, either legislative, executive, or judicial, attaches for the time being, and which is exercised for the benefit of the public. The chairman of a state central committee possesses no such authority, and is therefore not a public officer.

**Injunction — constitution — writ of mandamus — correlative — civil or property rights — not limited to — sovereignty of state — franchises — prerogatives — liberties of the people — political and civil rights — attorney general — opposition to — may issue.**

6. The writ of injunction contemplated by § 87 of the Constitution of North Dakota is correlative with the writ of mandamus, the former issuing to restrain and the latter to compel action, and is not limited to cases involving civil or property rights, but may be resorted to in all cases affecting the sovereignty of the state, its franchises, or prerogatives, or the liberties of the people. It includes within its scope and protection political as well as civil or property rights, and may be issued under a proper showing and in the discretion of the court even at the suit of a private individual and against the opposition of the attorney general himself.

**Political matters — state central committee — courts — control — statutes — constitution.**

7. The courts will not assume a greater control of or supervision over purely political matters than can clearly be deemed to have been conceded to them by the express provisions of the statutes and of the Constitution.

**Political party — central committee — members thereof — chairman — supreme court — prerogative writ — political act — subject to political remedy — writ will not issue.**

8. The majority of the members of a political state central committee has the inherent power to depose or elect a chairman at any time, and the supreme court will not issue its high prerogative writs in order to bring about that which voluntary political action can perform.

**State central committee — membership of — chairman — laws — prerequisites to chairmanship.**

9. Section 890 of the Compiled Laws of 1913 examined and *held* not to make membership in the state central committee prerequisite to its chairmanship.

Opinion filed October 12, 1916.

Original application to the Supreme Court for the issuance of its prerogative writs in order to oust one Fred McLean from the position of chairman of the Democratic State Central Committee.

Application denied.

Statement of facts by BRUCE, J.

This is an application for the exercise of jurisdiction of this court, and is brought to test the right of Fred McLean to the office of chairman of the Democratic state central committee.

The amended petition is as follows:

Comes now D. H. McArthur, and for amended petition respectfully represents unto your Honors and alleges:

That he is a citizen, resident, and legal voter of the state of North Dakota, affiliating with and is a member of the Democratic party, and at the recent primary election in this state your petitioner was nominated as the candidate of the Democratic party for the office of governor of the state of North Dakota, and is now such candidate.

That since said primary election the members of the state central committee of the Democratic party were duly selected and named in the manner prescribed by law, there being forty-nine members so selected as state central committeemen. A list of said members appears attached to the original petition herein and is hereby referred to and made part hereof.

That on the 6th day of September, 1916, twenty-one members of

said state central committeemen so selected met at Bismarck as required by law, and there met together with them at the same time and place twelve other persons, each of whom held a proxy given to him by a duly elected committeeman purporting to authorize the holder of such proxy to attend such meeting of the state central committee, and act and vote for and represent the elected committeeman in the latter's absence.

That at said meeting the twelve persons so holding proxies were permitted to act and exercise the powers of regularly elected committeemen, and such holders of such proxies were counted in order to constitute a majority of said committee, although, as before stated, there were only twenty-one elected committeemen present at said meeting.

That at said meeting, composed as aforesaid of said twenty-one committeemen and the twelve persons holding proxies of absent committeemen, the majority of the persons so present at said meeting and pretending to constitute a majority of the state central committee selected and named one Fred McLean to be chairman of said state central committee and one Joseph Kelly to be treasurer thereof, and one W. E. Beyerly to be temporary secretary, and said Fred McLean and said Joseph Kelly accepted said respective offices and are now holding and exercising the same.

That neither said Fred McLean nor said Joseph Kelly were or ever had been selected or named as members of said state central committee, and, therefore, as your petitioner is advised and verily believes, they, the said Fred McLean and Joseph Kelly, were not eligible to said offices to which they were so named, and said meeting not being a majority of the members of said state central committee, a quorum of said committee was not present participating in said meeting, and hence all the acts of said meeting were and are null and void; and for the reasons aforesaid your petitioner is advised and verily believes that said Fred McLean and Joseph Kelly are unlawfully holding and usurping said respective offices.

That at said meeting so held as aforesaid the persons there present, pretending to be a majority of said committee, ordered and appointed an executive committee consisting of E. H. Stenwick, H. Nelson Kelly, H. D. Allert, John Sprafka, A. J. Schorer, Kenneth Ferguson, and Joseph Mann.

That your petitioner is advised and believes that there is no adequate remedy for the unlawful usurpation of said offices by the said Fred McLean and Joseph Kelly except by the exercise of the original jurisdiction of this Honorable Court, and, therefore, your petitioner presents this petition in his own behalf and in behalf of all other citizens and electors of the state of North Dakota, and prays that this court issue its process to said Fred McLean and Joseph Kelly, and to the members of said Democratic State Central Committee, requiring them to be and appear before this court and answer this petition, and that this court thereupon adjudge that said Fred McLean and Joseph Kelly are unlawfully usurping said respective offices now so held and claimed by them, and that they, and each of them, be ousted therefrom, and be forever enjoined and forbidden to intrude into or exercise the functions of said offices, and that said State Central Committee be ordered and required to forthwith meet and properly organize in accordance with the law, adopt rules and regulations, and publish and promulgate a platform of principles for the candidates of said Democratic party at the coming election.

To this petition the defendants first filed a motion to dismiss the proceedings, which was as follows:

Come now the defendants in the above-entitled action, and respectfully show to the court

1.

They each separately and all jointly object to the jurisdiction of the court and to the consideration by the court of the petition and amended petition served and filed in the above-entitled matter, for the reason that it appears upon the face of said petition and amended petition that the said defendants F. W. McLean and Joseph M. Kelly are not usurping or attempting to usurp, intrude into, or unlawfully hold or exercise, any public office or franchise within this state, or are doing or attempting to do any act, or hold or exercise the authority of any public office, within the state of North Dakota, and that the court has no jurisdiction of the subject of the action.

### 2.

That each separately and all jointly object to the consideration of the petition or amended petition in the above-entitled action, and move to dismiss the same for the reason that it appears upon the face thereof that the subject of the proceedings does not involve any public function, neither does it involve any matter in which the public is concerned. That it involves a mere private desire without a showing of perceivable benefit to the relator or any other person.

### 3.

They each separately and all jointly object to the consideration by the court of the petition and amended petition herein, for the reason that it appears upon the face of said petition and amended petition that the said defendants Fred McLean and Joseph M. Kelly were elected to offices or positions upon a political committee, which offices or positions are in no sense public offices, either civil or military, under the laws of the state of North Dakota.

That neither the state in its sovereign capacity, nor the public as a public, is concerned in the subject-matter involved and set forth in said pleadings.

That the relator is a private person, having no interest in the subject-matter other than a purely personal and private one, and that no benefit or result to either the public or to any person is disclosed by the pleadings.

That conceding all of the facts set forth in said petition and amended petition, there is not set forth such facts or such subject for consideration as calls for the issuance of an original writ by this court, or entitles the relator to the relief prayed for.

Wherefore, defendants pray this Honorable Court for an order dismissing said above-entitled proceedings.

They then filed the following demurrer:

Now come the above-named defendants and reserving to themselves separately and jointly all manner of advantage to which they or either of them is entitled by reason of answer or motion to dismiss, and without waiving any rights by reason of written motion to dismiss said

above proceedings, and for the purpose of demurring to the pleadings and all of the pleadings on behalf of the relator and to the cause of action therein set forth, respectfully shows to the court.

## 1.

They each separately and all jointly demur to the petition and amended petition of the relator above named and to the cause of action therein set forth, that the court has no jurisdiction of the subject of the action therein set forth, on the ground and for the reason that the said office of chairman of the State Central Committee of the Democratic Party in the State of North Dakota, and that the office of treasurer of said state central committee, is not a public office either civil or military or any franchise within this state, neither does said office or either of them come within the provisions of any law of the state of North Dakota conferring upon this court jurisdiction to hear and determine the right thereto in these proceedings.

## 2.

They each separately and all jointly demur to the petition and amended petition of the relator above named, and to the cause of action therein set forth, for the reason that the plaintiff or relator in said proceedings has no legal capacity or right to institute and prosecute such proceedings, it appearing from said pleadings that the interest of the relator is a purely personal and private interest, and does not involve any governmental function or public concern.

## 3.

They each separately and all jointly demur to the petition and amended petition of the relator above named, and to the cause of action therein set forth, on the ground and for the reason that neither said petition nor amended petition state facts sufficient to constitute a cause of action or entitle the relator to the relief prayed for or to any relief.

## 4.

That each separately and all jointly demur to the petition and

35 N. D.—14.

amended petition of the relator above named, and to the cause of action therein set forth, on the ground and for the reason that there is a defect of parties plaintiff in that said proceedings, if maintainable at all, should be maintainable only at the instance of the attorney general.

Wherefore, defendants pray judgment that said action be dismissed with costs.

An order to show cause was granted on the petition, the court by this means reserving to itself an opportunity to consider the question of its jurisdiction in the premises; on the hearing, however, both the question of jurisdiction and the points raised by the demurrer were argued.

*Engerud, Holt, & Frame,* for petitioner.
*Bangs, Hamilton, & Bangs,* and *Halvor L. Halvorson,* for defendants.

BRUCE, J. (after stating the facts as above). The first question to be determined is whether the supreme court can, in the exercise of its original jurisdiction, interfere with or supervise the conduct of the members of the state central committee of the respective parties of this state, and insist that such committee shall conform to the provisions of the statute and of the Constitution in relation to the selection of their officers.

The second is whether, if the court has this power, it should exercise it, the rule seeming to be that its discretion is at any rate involved in all such matters.

Section 86 of the Constitution of North Dakota provides: "The supreme court, except as otherwise provided in this Constitution, shall have appellate jurisdiction only, which shall be coextensive with the state, and shall have a general superintending control over all inferior courts under such regulations and limitations as may be prescribed by law."

Section 87 of the Constitution of North Dakota provides that the supreme court "shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, injunction and such other original

and remedial writs as may be necessary to the proper exercise of its jurisdiction, and shall have authority to hear and determine the same; provided, however, that no jury trial shall be allowed in said supreme court, but in proper cases questions of fact may be sent by said court to a district court for trial."

Section 7339 of the Compiled Laws of 1913 provides: "The supreme court shall have and exercise appellate jurisdiction only, except when otherwise specially provided by law or the Constitution. The supreme court has power in the exercise of its original jurisdiction to issue writs of habeas corpus, mandamus, quo warranto, certiorari and injunction; and in the exercise of its appellate jurisdiction and in its superintending control over inferior courts it may issue such original and remedial writs as are necessary to the proper exercise of such jurisdiction; provided, that said court shall exercise the said original jurisdiction only in habeas corpus cases and in such cases of strictly public concern as involve questions affecting the sovereign rights of the state or its franchises or privilege."

The statute now under consideration provides:

"§ 890. The county committee of each party shall be composed of all the precinct committeemen of each party in addition to committeemen chosen at large by the following named county nominees of each party, selected in the following manner, to wit: The nominees for the following county offices; namely: clerk of court, county treasurer, county auditor, register of deeds, sheriff, state's attorney, superintendent of schools and county judge, and the legislative nominees residing in such county shall each be entitled to select and appoint in writing one committeeman at large, which appointment shall be immediately filed with the county auditor. The committeeman thus appointed, together with the precinct committeemen elected as prescribed in § 889, shall constitute the county committee of each county, and they shall meet in the courthouse at the county seat of each county at 2 o'clock P. M. on the third Wednesday after each primary election and organize by selecting a chairman, a secretary and a treasurer, by adopting rules and modes of procedure, and by selecting an executive committee consisting of from five to nine persons chosen from the county committee, of which executive committee the chairman and secretary shall be members. Such county committee shall at the same time select one

person who shall be a legal voter to act upon and be a member of the state central committee of such party in all counties consisting of one legislative district, and in counties having more than one legislative district the precinct committeeman from each legislative district shall select one person from their respective legislative district; and when two or more counties are embraced in one legislative district the county committee of each county shall meet at the courthouse of the county seat of the senior county of such district at 2 o'clock P. M. on the fourth Wednesday after each primary election and select one person, who shall be a legal voter, to act upon and be a member of the state central committee of such party. The members so selected as state central committeemen shall meet at the state capitol on the first Wednesday of September and organize by selecting a chairman, a secretary and treasurer, and shall adopt rules and modes of procedure and promulgate and publish a platform or principle upon which its candidates shall stand. Each member of any committee shall retain such position until his successor is chosen. Every member so selected shall be a legal voter. Vacancies shall be filled by a majority of the committee by appointment from the district in which such vacancy exists."

In the case at bar the attorney general of the state has expressed his willingness that the proceedings shall be brought, but has refused to bring them himself, as he considers that it is not a case in which his office should be concerned.

The case, therefore, is similar to one in which an application has been made to the attorney general to institute the proceedings, but he has refused to do so, and where an application is made to this court by a private citizen to bring them. It is not, therefore, a case in which the state as a state is seeking to exercise its sovereign power and to assert its prerogative, but a case in which a private citizen and voter and a candidate for public office, who is more or less affected by the matter, seeks the protection of this court on the ground that the sovereign rights of the state or its franchises are after all the sovereign rights and franchises of all its citizens, and that all of its citizens are interested in having the political and elective machinery of the state properly administered.

If these public interests are, in fact, involved, this court will and should assume jurisdiction in the matter, for, as was well stated by

the supreme court of Wisconsin, "this court cannot play fast and loose with the subject of jurisdiction. It either has it absolutely whenever a proper cause is presented, or else it has not got it at all. If it has jurisdiction in such a cause, it is because it has been conferred on the court by the people in their sovereign capacity, in the clause of the original law quoted. If such jurisdiction is thereby vested in the court,—as must be conceded by all,—then it would seem to be idle to deny the jurisdiction in such action merely because the attorney general has refused to co-operate or consent." State ex rel. Lamb v. Cunningham, 83 Wis. 90, 17 L.R.A. 145, 35 Am. St. Rep. 27, 53 N. W. 35.

In the case of State ex rel. Moore v. Archibald, 5 N. D. 359, 66 N. W. 234, this court held that the constitutional provisions similar to our own could not be construed as conferring upon the supreme court appellate jurisdiction merely, and the power to issue writs in furtherance of that appellate jurisdiction merely, as two of them, namely, injunction and quo warranto, were writs which could neither be employed in aid of the appellate jurisdiction nor of the superintending control conferred upon the court. It, therefore, held that all of the writs mentioned could be used in all cases as well in furtherance of jurisdiction as to initiate it, in aid of superintending control and of appellate jurisdiction, as well as in the exercise of original jurisdiction. It, however, held that it could not have been the intention to confer upon the supreme court concurrent jurisdiction with the district courts in all cases, but only in instances where what might be called prerogative writs could formerly have been issued by the English Court of King's Bench. In speaking of these writs it classed the writ of injunction as a quasi prerogative writ. It held that, in the case of those writs which are put to both private and public uses, the grant of power to the supreme court is limited to those cases in which, though the interests of private suitors may more or less be involved, the prerogatives of the sovereign power are also involved in some public and important respect, or the liberty of its citizens is at stake.

In defining the boundaries of this original jurisdiction, this court said that it was not enough that the question should be *publici juris*, but it should be one affecting the sovereignty of the state, its fran-

chises or prerogatives, or the liberties of its people, and that it should involve in some way the general interests of the state at large.

To warrant the assumption of original jurisdiction, this court said: "The interest of the state should be primary and proximate, not indirect or remote; peculiar perhaps to some subdivision of the state, but affecting the state at large in some of its prerogatives; raising a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state in its sovereign character, this court judging of the contingency in each case for itself. For all else, though raising questions *publici juris,* ordinary remedies and ordinary jurisdictions are inadequate, and only when for some peculiar cause these are inadequate, will the original jurisdiction of this court be exercised for protection of merely private or merely local rights."

See also State ex rel. Steel v. Fabrick, 17 N. D. 532, 536, 117 N. W. 861; State ex rel. Linde v. Taylor, 33 N. D. 76, L.R.A.—, —, 156 N. W. 561.

Again, in the recent case of State ex rel. Linde v. Taylor, supra, and in the case of State ex rel. Bolens v. Frear, 148 Wis. 456, 500, L.R.A.1915B, 569, 606, 134 N. W. 686, 135 N. W. 164, Ann. Cas. 1913A, 1162, one of the tests of jurisdiction was stated to be, "whether the private relator was in fact a necessary party at all or a mere incident, and whether it was after all a public injury which was sought to be remedied or prevented."

If we apply these tests to the case at bar we cannot help but hold that the sovereignty of the state is in no way affected, and that it was this question of sovereignty which alone was relied upon by this court in many of the cases where jurisdiction has been assumed.

In the cases of State ex rel. Moore v. Archibald, supra, this court expressly states that while the contest was nominally between two individuals claiming the office of the superintendent of the state insane asylum, the real question involved was whether a state administrative board should be allowed to exercise that portion of the sovereignty of the state vested in it by the statute giving the board the general management and control of a state institution, and the power to remove at any time the superintendent and appoint a new one in his place. "This institution," it said, "receives a large appropriation of state funds, and is placed by the legislature under the control of a board

of trustees. It certainly concerns the sovereignty of the state, not remotely and in a trifling particular, but directly and in a very important sense, whether one citizen shall defy the sovereignty of the people, and, by retaining his office of superintendent after removal, usurp to that extent the control of a great and expensive state institution. This court does not give relief in this case out of any consideration for the private rights of the relator, but solely to uphold the sovereignty of the state against a direct attack upon it in a matter of great public importance."

The same considerations applied in the case of State ex rel. Erickson v. Burr, 16 N. D. 581, 113 N. W. 705, and where the right of a district judge to administer the important and sovereign duties of his office was concerned.

They also applied in the case of State ex rel. Baker v. Hanna, 31 N. D. 570, 154 N. W. 704, where the State Board of Immigration was required to organize and assume its ministerial functions.

Nor can it be strictly said that any franchise of the sovereign state is concerned, that is to say, the exercise of any right granted to it or reserved to it by the Constitutions, state and national, in its governing and property-holding capacity.

This court, however, in many recent cases has expanded the rule as apparently first laid down in the case of State ex rel. Moore v. Archibald, supra, and has held that the right to the untrammeled exercise according to law of the elective franchise, even though, strictly speaking, a right of franchise of the individual citizen rather than of the collective and sovereign state, and even though it, is in a limited area as in a county, is a matter not only *publici juris,* but one which ultimately affects the self-governing franchises and prerogatives of the sovereign state itself, and can, in the discretion of the court, and in exceptional cases, be safeguarded by the issuance of its prerogative writs. See State ex rel. Steel v. Fabrick, 17 N. D. 532, 117 N. W. 860; State ex rel. Buttz v. Lindahl, 11 N. D. 520, 91 N. W. 950; State ex rel. Fosser v. Lavik, 9 N. D. 461, 83 N. W. 914.

The situation then is this. The writ of quo warranto when used as a high prerogative writ was at first only used to test the right to some public office, and even then could only issue at the instance of a proper official representative of the government. State ex rel.

Butler v. Callahan, 4 N. D. 481, 61 N. W. 1025; High, Extr. Leg. Rem. § 45, note 6. .

In the case at bar the office involved is not a public office, as the occupant performs no governmental functions. A public office is "a public position to which a portion of the sovereignty of the country, either legislative, executive, or judicial, attaches for the time being, and which is exercised for the benefit of the public." It implies an authority to exercise some portion of the sovereign power of the state either in making, administering, or executing the laws. See notes to 30 Am. Dec. 44, and 63 Am. St. Rep. 181.

The chairman of a state central committee possesses no such authority, and he is therefore not a public officer.

The courts, too, and under constitutional provisions similar to our own, at first doubted whether the equitable writ of injunction would and should issue except where property rights were directly involved. See note to 3 L.R.A.(N.S.) 382.

Later, however, though hesitatingly, they repudiated this idea, and came to hold that the writ of injunction contemplated by the constitutional provisions referred to was correlative with the writ of mandamus, the former issuing to restrain while the latter compels action, and that the prerogative writ of injunction of which the supreme courts of Wisconsin and North Dakota, and no doubt many other states, are given original jurisdiction, by their various constitutional provisions, is a writ of a different nature and having a different scope and purpose from an ordinary injunction in equity, and is not limited to cases involving civil or property rights, but may be resorted to in all cases "affecting the sovereignty of the state, its franchises or prerogatives, or the liberty of the people," and thus includes within its scope and protection political as well as civil or property rights, and may be issued under a proper showing and in the discretion of the court, even at the suit of a private individual and against the opposition of the attorney general himself. Note to 3 L.R.A.(N.S.) 382. See State ex rel. Atty. Gen. v. Cunningham, 81 Wis. 440, 15 L.R.A. 561, 51 N. W. 724; State ex rel. Lamb v. Cunningham, 83 Wis. 90, 17 L.R.A. 145, 35 Am. St. Rep. 27, 53 N. W. 35; State ex rel. Moore v. Archibald, 5 N. D. 359, 66 N. W. 234; State ex rel. Erickson v. Burr, 16 N. D. 581, 113 N. W. 705.

They held, and the North Dakota court held, in such cases, however, that is to say where the sovereignty of the state was not directly affected, where no public office was involved or the franchises and prerogatives of the state as a whole concerned, and where all that could be said was that the matter was *publici juris* and indirectly affected the public as a whole, by involving the local franchise of the citizen or his political rights, that the high prerogative writs of the supreme court should and could only issue in extreme and exceptional cases and where there was an imperative demand for the same.

But here there is no such demand. The meeting was duly called and at the time prescribed by statute. We must presume that those members who desired to be present were present there. We have no protest from any of the members of the central committee, but merely from an outsider, who, though he is deeply concerned in the matter, had no voice or vote. A majority was certainly represented if the proxies are to be counted. If the result of the meeting was not satisfactory to the majority another meeting could have been called and may still be called, and any mistake made could and can still be corrected. There is nothing said in the statute as to the term of office of the chairman, and we see nothing to prevent the majority from reconsidering the action taken and choosing whom they will. Why should this court be called upon to do that which the majority of the committee have still the power to do? We are asked to oust the present chairman. Why cannot the committee do that themselves? If the platform as promulgated is not satisfactory, the remedy is still in the hands of the committee. There is really nothing for us to do; the matter is purely a political one.

Formerly the courts would not have concerned themselves with these matters at all, but would have left them entirely for the political tribunals to determine. Though our recent statutes have made material innovations in our election laws, and, in many respects, have put many matters which were purely political, and which concerned the members of the respective parties merely, both under legislative control and the authority of the courts, we have no right to assume that it was the legislative intention that these purely political matters should be interfered with to any greater extent than was clearly expressed by the statutes, or that it was the intention that the courts should have

any greater powers in the matter than might be clearly implied from the language of the acts themselves. The authority of the courts even now can be no greater or more comprehensive than is necessary to carry out the clearly expressed legislative will and intention, and in order that they may be increased, or be assumed to have been increased, there must be a clear indication of that will and of that intention.

As we view the case, no exercise of its jurisdiction is required of this court. For the future guidance of the parties, however, and in order that a legislative change may be made in the statute if such change is desired as well as to make clearer what we have already said, we will express our opinion as to the main points of the controversy.

We are satisfied that membership in the central committee is not necessary to its chairmanship, and this for the simple reason that the act of the legislature does not make it necessary, and we have no right to interpolate anything into the statute. In order to hold that the chairman of the State Central Committee must be a duly elected member of that body we must interpolate.

There is an express provision that the executive committees of the countries shall be members of the county committees and that the chairman and secretaries of the county executive committees shall be chosen from the membership of such county committees, but when the *same section* of the statute later deals with the state central committee no such provision is to be found. All it says is that "the members so selected as state central committeemen shall meet at the state capitol on the first Wednesday of September and *organize by selecting* a chairman, a secretary and treasurer, and shall adopt rules and modes of procedure, and promulgate a platform or principles upon which its candidates shall stand."

We must assume that the legislature, in omitting this requirement as to membership in the committee in this subsequent clause, and when it was dealing with the state central committee, did so advisedly, and we have no right to interpolate words or provisions which they must be presumed to have purposely omitted.

It has been the almost uniform ruling of the courts in the case of private corporations that the president, secretary, treasurer, and even the directors; may be chosen from persons who are not even stock-

holders, unless there is some positive provision in the statute, the charter, or the by-laws prohibiting such a practice, and certainly the same construction of the statutes should be applied in the case of political committees as in passing on the acts which create and define the powers and duties of these corporations. See Cook, Corp. 6th ed. §§ 11 and 623; 1 Michie, Bkg. 257; Thomp. Corp. 2d ed. §§ 916, 917; Hume v. Commercial Bank, 9 Leo, 728; Bristol Bank & T. Co. v. Jonesboro Bkg. & T. Co. 101 Tenn. 545, 48 S. W. 228; Camden Safe Deposit & T. Co. v. Burlington Carpet Co. — N. J. Eq. —, 33 Atl. 479; Re St. Lawrence S. B. Co. 44 N. J. L. 529; Hoyt v. Bridgewater Copper Min. Co. 6 N. J. Eq. 253, 275; State ex rel. Atty. Gen. v. McDaniel, 22 Ohio St. 354, 367; Wight v. Springfield & N. L. R. Co. 117 Mass. 226, 19 Am. Rep. 412; Wright v. Floyd, 43 Ind. App. 546, 86 N. E. 971; Fey v. Peoria Watch Co. 32 Ill. App. 618; Buffalo Electro-Plating Co. v. Day, 151 App. Div. 237, 135 N. Y. Supp. 1054; Horbach v. Tyrrell, 48 Neb. 514, 37 L.R.A. 437, 67 N. W. 485; People v. Northern R. Co. 42 N. Y. 217.

The courts indeed have held uniformly that a director of a corporation is merely an *agent,* and, being such, in the absence of an express statutory or charter requirement, need not be a stockholder. Surely the same reasoning applies to the chairman, secretary, and treasurer of political committees, and where such officers are, as we all know, merely campaign managers. Thomp. Corp. 2d ed. §§ 916, 917; Cook, Corp. 6th ed. §§ 11 and 623; 1 Michie, Bkg. § 257.

The reason for the holdings of the courts in these matters is quite apparent. In the first case it is the province of the courts to construe and to enforce the commands of the legislature, and not to themselves legislate. In the second there are many good reasons for the legislative policy referred to. The officers of a corporation, in order to properly serve its interests, must have technical and business experience, while all that is necessary to the stockholders is that they shall have the money with which to pay for their stock. Often, therefore, there are among the stockholders, none who possess this business and technical experience, and it is but reasonable that others should be permitted to be employed.

The same thing is true of political state central committees. The chairman is a campaign manager rather than a presiding officer, and

the duties of the secretary and treasurer are merely ministerial. It often happens that there is none among the members of these committees who has the time, ability, or inclination for this compaign and routine work. If, as is stated by the writers, the directors of a corporation may be considered in the light of agents merely, and as such, and in the absence of a statutory or charter provision, are required only to possess the usual qualifications of agents, much more must this be true of these political agents.

If, too, the construction which is contended for by the petitioner applies, not only must the chairman be a member of the committee, but the secretary and treasurer also, for the offices are all treated together in the same connection and in the same sentence. The committee is instructed to select not a chairman merely, but "a chairman, secretary, and treasurer." When, however, we come to examine the records of the past, we find that the secretary of the Republican State Central Committee was not such a member in 1898, 1900, 1902, 1904, 1906, 1910, and 1912, nor was the secretary of the Democratic State Central Committee in 1896, 1898, 1902, 1904, 1906, 1908, 1910. We also find that in 1896, 1898, 1908, 1910, and 1912 and 1916 the chairman of the Republican State Central Committee was not such a member, nor was the chairman of the Democratic State Central Committee such a member in the years 1906 and 1910, nor was the treasurer of the Democratic committee a member in the years of 1906, 1908, and 1910.

The act which we are called upon to construe became a law in 1907. We must assume that at the time of its passage the members of the legislature were cognizant of the political history and practices of the past, and that, when they omitted the requirement of membership which they had expressly provided in the same section of the statute in the case of county and district committees, they did this advisedly. The practice also which has since been followed in the matter, and in both of the political parties mentioned, surely furnishes some proof of a contemporaneous construction. We, too, must remember that the legislature contained representatives of and was legislating for both of the principal political parties of the state, and must therefore have considered the practices which prevailed in each.

It is also urged that a majority of the members of the state central

committee was not present at the election or selection in question, and that the proxies of absent members were used. The use of proxies, however, in political bodies has throughout the history of the state almost universally prevailed and been conceded, and was recognized by the legislatures of 1890 and 1895 by regulating, but not prohibiting the same. (See Comp. Laws 1913, § 9294; Rev. Codes 1895, § 6899; Laws 1890, § 1, chap. 112). We must assume, therefore, that the right still prevails. It is also to be noticed that the statute in controversy expressly gives to the state central committee the power to adopt its "own rules and modes of procedure," and this power in the light of the practice of the past would seemingly include that of recognizing proxies. There, too, is no showing that the petitioner was not elected or selected by a majority of the elected members of the committee who were present, and that the use of the proxies was in anyway necessary to the choice. There is nothing in the statute which requires that a majority of the elected committeemen shall be present at such a meeting, and as the meeting was a regular meeting where date and place was fixed by the statute, and as no majority vote of the elected members was expressly required, we are at liberty to assume that it was the intention of the legislature that a majority vote of those present should be all that was necessary, as is the case in elections generally. But be this as it may (and we are free to admit that we entertain much doubt upon this question), the matter is purely a political one. We have not here the case of two rivals contesting for the same office and each claiming to have been properly elected, but a questioned authority merely with no rival applicant. We have not indeed the elements of a judicial controversy, and surely this court cannot compel the absent members to be present any more than it can compel the voters to go to the polls or the members of the legislature to travel to Bismarck and to perform their duties. When the supreme court of Wisconsin declared two successive gerrymanders of the state unconstitutional, it stopped at that, and did not attempt to summon the legislature to meet again, though such action on the part of the legislature was absolutely necessary. (See State ex rel. Atty. Gen. v. Cunningham, 81 Wis. 440, 15 L.R.A. 560, 51 N. W. 724; State ex rel. Lamb v. Cunningham, 83 Wis. 90, 17 L.R.A. 145, 35 Am. St. Rep. 27, 53 N. W. 35.)

These matters are for political or party discipline, and not for the intervention of the courts. We cannot oust the said McLean from his chairmanship, for there is no other claimant, and the franchises and prerogatives of the state are not involved as he is in no sense a public officer. The term "public office" implies an authority to exercise some portion of the sovereign power of the state either in making, administering, or executing the laws, and that no such authority is possessed by the present complainant must be apparent to all. 6 Words & Phrases, 4933 et seq.; Ritchie v. People, 155 Ill. 98, 29 L.R.A. 79, 46 Am. St. Rep. 315, 40 N. E. 461; 29 Cyc.·1364; 63 Am. St. Rep. 183, note; 30 Am. Dec. 47, note; Atty. Gen. v. Drohan, 169 Mass. 534, 61 Am. St. Rep. 305, 48 N. E. 279.

We are aware of our decision in the recent case of State ex rel. Baker v. Hanna, 31 N. D. 570, 154 N. W. 704, and in which we required the State Board of Immigration to meet and organize, but this was a ministerial body, and not a political committee.

That the control of the procedure and method of doing business of the state central committee was not contemplated by the legislature, or considered essential to the scheme of election that they were inaugurating, is also quite evident to us from the fact that in the first so-called Primary Election Act (Laws 1905, chap. 109), nothing whatever was said in regard to the election, membership, or organization of this body, while in the subsequent act (Laws 1907, chap. 109), the only provision was that they should meet at the state capitol and organize by selecting a chairman, secretary, and treasurer.

But it is argued that a practice which would allow the selection of a chairman who was not a duly elected member of the committee would destroy the equal representation in that body, and give to some one district two votes and two representatives. The force of this objection, however, is not apparent to us. In the first place if the committee may not choose as chairman one not duly elected, they cannot employ a secretary and a treasurer who are not such members, as the statute joins the three, and says expressly that they shall "select a chairman, a secretary, and treasurer;" and, as we have before stated, the secretary and treasurer have almost always been treated as purely ministerial officers. In the second place the selection as chairman of a meeting or committee does not necessarily carry with it any voting

power. In the third place if all of the members of the state central committee may take part in the selection of a chairman, and even if he be conceded a vote, how is the representative system violated any more than in the numerous cases where delegates and members at large are permitted to be chosen?

The petition is denied.

Fisk, Ch. J., and Burke, J., did not participate. Honorable W. L. Nuessle, of the Sixth Judicial District, sat in their place.